627 F.2d 745
 In the Matter of the Petition of Josette GEISSER, Divorced Bauer, a/k/a
Paulette Louise Fallai. Josette Clair BAUER, Nee Geisser,
a/k/a Paulette Louise Fallai, Petitioner- Appellee,
v.
UNITED STATES of America, Respondent-Appellant,
Hector Graber, Consul General of the Government of
Switzerland, Intervenor- Appellant.
 No. 79-3869.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 10, 1980.
Rehearing and Rehearing En Banc Denied Nov. 6, 1980.
 
 Brooksley E. Landaul, Peter R. Maier, Washington, D. C., for Consul General of Switzerland.
 Sidney Monte Glazer, Atty., Dept. of Justice, Washington, D.C., for United States.
 William C. Marchiondo, Albuquerque, N. M., for petitioner-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HENDERSON, POLITZ and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This case comes to the Court for the third time. Josette Bauer nee Geisser is a Swiss citizen. On September 13, 1964, she escaped from prison in Switzerland. When she escaped, she had more than two and one-half years remaining of a sentence for aiding and abetting in the murder of her father for financial gain.
 
 
 2
 On August 31, 1967, she was arrested in Miami, Florida, with an accomplice, Willy Lambert. They were charged with attempting to smuggle twenty-eight pounds of heroin into the country. She and her companion were indicted by a grand jury for felonies which would normally lead to sentences of thirty to forty years in prison.
 
 
 3
 The Swiss government was immediately interested in the apprehension of Josette Bauer and instituted extradition proceedings under the 1900 extradition treaty between the governments of Switzerland and the United States. 31 Stat. 1928. An extradition hearing was held in the United States District Court for the Southern District of Florida. Bauer and her counsel participated. Judge Atkins issued an order dated November 2, 1967, certifying that Bauer was subject to extradition to Switzerland.
 
 
 4
 Shortly thereafter, the United States Attorney's Office in Florida concluded a plea bargain with Bauer and Lambert under which it was agreed that they would reveal all they knew about the conspiracy to smuggle heroin from France and Switzerland in which they were involved and that they would testify in the event there were trials of others involved in the conspiracy. In turn, the government promised that they would be reindicted for lesser offenses which would lead to sentences of no more than seven years, that they would be paroled after three years, and that the government would make its "best efforts" to avoid their "deportation" to France or Switzerland.[1]
 
 
 5
 In accordance with the plea bargain, lesser indictments were obtained, and Bauer and Lambert were sentenced to seven years.
 
 
 6
 It has been agreed throughout that Josette Bauer upheld her end of the plea bargain to the greatest possible extent in revealing information and serving as a witness. She was characterized as a witness with an outstanding memory for names, dates, places, and other facts. The United States Attorney said her testimony was a major factor in breaking up a large international conspiracy to smuggle heroin into the United States.[2]
 
 
 7
 On October 10, 1969, Bauer escaped from federal prison. She had served just over two years of her seven year sentence, short of the three year period at which she had been promised parole. There is remarkably little reference in subsequent opinions in the District Court concerning this escape. There is some indication that the Federal District Judge, Judge Mehrtens, accepted the explanation that she had escaped because of her fear of being extradited after three years because she had overwhelming fears for her life if she was returned to Switzerland.
 
 
 8
 Bauer was apprehended in Albuquerque, New Mexico, on June 25, 1972, where she was living apparently as a law abiding and respected citizen under the name of Jean Baker. She was operating a school in horsemanship for children.
 
 
 9
 Because of her escape, the Department of Justice disavowed the plea bargain. No attempt was made to obtain her parole at the end of three years, and she was sentenced to a consecutive eighteen months in prison for her escape.
 
 
 10
 When it appeared that the Department of Justice was no longer going to undertake to live up to the plea bargain, Bauer brought this proceeding for habeas corpus, for injunctive relief against extradition, and for such other relief as would force the government to carry out its promises in the plea bargain.
 
 
 11
 Judge Mehrtens, United States District Court for the Southern District of Florida, granted the petition for habeas corpus after a hearing on August 8, 1973. The order directed that Bauer be discharged from any detention and that the order of extradition be vacated. Further the order "forever restrained" the United States government from executing or attempting to execute the terms of the extradition order.
 
 
 12
 On appeal, this Court vacated and remanded. Geisser v. United States, 513 F.2d 862 (5th Cir. 1975). Chief Judge Brown, writing for the court, found that the federal government had an obligation to carry out the plea bargain made, and that it had not done so. The case was remanded for consideration by the involved governmental officials at the highest level in order for them to "state unequivocally the position of the United States government." 513 F.2d at 872. The Court went on to require that in the event the position taken by the government did not result in the release of Bauer, the District Court was directed to conduct further hearings to determine just what the government had done with respect to the promise "to use our best efforts" . . . .
 
 
 13
 Following this remand, the United States government undertook steps to exercise its "best efforts". Deputy Attorney General Harold Tyler wrote Secretary of State Kissinger reporting the facts, including the plea bargain. The letter made a brief formal request that the Secretary of State assist in "resolving this vexing problem". Approximately five months later Deputy Secretary of State Robert S. Ingersoll responded to the Department of Justice. He detailed exchanges of notes with the Swiss government in which the Swiss government maintained its request for extradition and insisted that not granting extradition would violate the obligation of the extradition treaty. The Ingersoll letter further detailed a meeting in the Department of State in which the Swiss government remained adamant. Another note was then sent to the Charge d' Affaires of the Swiss embassy urging the government to withdraw the extradition request. By a letter to the Secretary of State on March 15, 1976, the Swiss government still insisted on extradition.[3]
 
 
 14
 Upon rehearing in the District Court on May 21, 1976, Judge Mehrtens found that these actions by the government were "too little and too late" to discharge its obligation contained in the plea bargain. The United States government and the Consul General of Switzerland who had been permitted to intervene again appealed. This Court again vacated and remanded. Geisser v. United States, 554 F.2d 698 (5th Cir. 1977). Judge Wisdom wrote the opinion for the majority of the panel. In evaluating the efforts detailed above, the majority found a fatal weakness in the failure of the Department of Justice to stress the particular emphasis upon Bauer's fears for her life if she were extradited to Switzerland. The Court gave the government "a reasonable time in which to use its 'best efforts' to prevent the extradition of Bauer to Switzerland or France". 554 F.2d at 706.
 
 
 15
 Judge Coleman dissented. He asserted that the solemn treaty obligation to extradite a Swiss citizen to Switzerland under these circumstances meant that it is impossible for any United States Attorney to make binding the kind of plea bargain which had been undertaken in this case. He would have entered an order directing immediate compliance with the treaty.
 
 
 16
 After this decision, the government again undertook to persuade the Swiss government to withdraw its extradition request. A thorough and detailed letter was written by Peter F. Flaherty, Deputy Attorney General, to Secretary of State Vance. The Secretary of State in a diplomatic communication to the Swiss ambassador requested that the government of Switzerland withdraw its extradition demand. This letter forwarded the Flaherty letter and adopted its contents. When the Swiss government again refused to withdraw its request for extradition, two informal meetings were held in the Department of State. The Swiss ambassador then communicated again with his government in an attempt to get the government to withdraw. These final efforts failed. The texts of the communications involved in these latest efforts of the United States government appear later in this opinion where an evaluation is made of the attempts by the United States government to get the Swiss government to change its mind.
 
 
 17
 Following these written efforts, but before the last meetings in the State Department, District Judge Mehrtens, after hearing on October 2, 1979, again vacated the extradition order. He directed that Bauer be released from any form of detention and be authorized to continue to reside permanently in the United States. The Judge characterized the efforts briefly described above as "nominal" and "wholly inadequate to fulfill" the government's obligation under the plea bargain.
 
 
 18
 The government of the United States and the Consul General of Switzerland have now again appealed to this Court.
 
 I. Retained Jurisdiction
 
 19
 A preliminary matter must be resolved. The Consul General of Switzerland in his appeal to this Court urged that the retention of jurisdiction by the Court at the conclusion of its 1977 majority opinion required that this appeal be heard by the same panel which heard the appeal at that time. The majority opinion in that case said, "While retaining jurisdiction we remand the case to the District Court . . . ", Geisser v. United States, 554 F.2d 698, 706 (5th Cir. 1977). Prior to oral argument in the current appeal, this panel concluded this contention was without merit.
 
 
 20
 In the 1977 opinion quoted immediately above there was no specific reference to the panel which heard the case. The word "we" was a reference to the Court and not a particular panel. There have been cases where a panel of this Court has retained jurisdiction as a panel. We conclude that such a retention of jurisdiction by a particular panel must be specific. The normal and usual retention of jurisdiction by a court is a retention of jurisdiction by the court in its regular and normal judicial processes and not a retention of jurisdiction by a particular judge or judges of that court.
 
 
 21
 The contention that this appeal had to be heard by the same panel which heard the 1977 appeal and retained jurisdiction for the Court is unfounded.
 
 II. The Facts and Law Controlling the Case
 
 22
 Two prior decisions of this Court have established the facts and the law controlling this case except insofar as there have been additional efforts by the United States government to carry out the obligation of the plea bargain since the decision of 1977. It is now established that:
 
 
 23
 1. There was a plea bargain under which the United States government promised Bauer certain concessions in return for her testimony and other information relating to the conspiracy to smuggle heroin into the United States from France or Switzerland.
 
 
 24
 2. Josette Bauer completely and effectively carried out her obligations under the plea bargain.
 
 
 25
 3. Earlier issues concerning the time that Bauer served in federal prison are now moot.
 
 
 26
 4. As part of the plea bargain the government promised to exert its "best efforts" to try to avoid the extradition of Bauer to Switzerland or France. Earlier assertions by Bauer that the plea bargain was an absolute promise that there would be no extradition have been resolved by the 1977 decision which draws a clear conclusion that the plea bargain was a "best efforts" promise only.
 
 
 27
 5. The opinions of this Court both in 1975 and 1977 decisions make clear that if the United States government has not expended its "best efforts" in accordance with the plea bargain Josette Bauer's constitutional rights have been violated.
 
 
 28
 Both opinions rely upon the case of Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Supreme Court there held that a plea of guilty induced by a promise of the government in a plea bargain is a binding obligation contractual in nature on the government. If a court's decision is made in response to such a plea of guilty, and then the United States government does not carry out its promises in the plea bargain, the constitutional due process rights guaranteeing a fair trial are violated.
 
 
 29
 In Santobello the Court held that the constitutional rights of the accused would be infringed even if there was no showing of an adverse impact from the failure to carry out the promise. In Santobello the judge disavowed following the sentencing recommendation which was made in violation of the plea bargain. The Court held, nevertheless, that inducing the guilty plea, and then failing to carry out the promise obtained in the plea bargain, did result in an infringement of the constitutional rights of the accused who had plead guilty. Bauer's jeopardy from serious consequences is obvious if the government does not carry out the promise made in the plea bargain.
 
 
 30
 Much of the argument made on behalf of Bauer in this case, and a number of the questions asked by the District Court as this case followed its labyrinthine course failed to define clearly the nature of the constitutional right which Josette Bauer claims. Upon analysis, it is quite clear that Josette Bauer can claim a constitutional infringement of her right to a fair trial only if it is determined that the United States government has violated the plea bargain.
 
 
 31
 If the United States government has not complied with the plea bargain, her constitutional claim is a valid one and a purported treaty obligation of the United States government cannot override an individual constitutional right. Judge Brown so indicated in his opinion in the 1975 case. Geisser v. United States, 513 F.2d 862, 869 fn.11 (5th Cir. 1975) (citing Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957)). But if the United States government has complied with the plea bargain then Bauer has no constitutional claim.
 
 
 32
 Succinctly, this means that Bauer's claim of constitutional right has no independent strength beyond the resolution of the single question of whether the government has carried out its promise under the plea bargain which was made.
 
 
 33
 III. Has the Government Now Exerted its "Best Efforts"?
 
 
 34
 Before the 1975 decision in this Court, the government had exerted no efforts of any consequence to carry out its plea bargain obligation concerning extradition. It took the position that Josette Bauer's escape from prison in 1969 and her almost three years as a fugitive justified a disavowal of the government's obligation. The 1975 decision confirmed a holding to the contrary. Chief Judge Brown, recognizing the "best efforts" promise, stated: "The best effort would, at a minimum, be a strong presentation to the Department of State as to what had been promised and the likely dangers to the bargainee-defendant-witness." Geisser v. United States, 513 F.2d at 869.
 
 
 35
 The 1977 decision of this Court found that the government had not complied with the mandate of the 1975 decision, particularly with respect to "the likely dangers" to Bauer. The 1977 decision found the efforts which had been made by the government consisted realistically only of a formal request that Josette Bauer not be extradited. There was no significant mention of the extremely important role which she had played in breaking up this international heroin smuggling conspiracy. Even more to the point, there was no specific mention of the great fears for her life and safety which she harbored if she were extradited, and the conclusion of Department of Justice personnel that her fears were well-founded.
 
 
 36
 The Court in the 1977 opinion laid down four specific matters which had to be strongly advanced by the government to achieve "best efforts". These required governmental assertions were:
 
 
 37
 (1) The reasons underlying the original bargain, (2) Bauer's admirable performance in keeping her part of the agreement, (3) her "intense fear of reprisals", and (4) the conclusion of Government agents on the case that her fears were well-founded.
 
 
 38
 Petition of Geisser, 554 F.2d 698, 703 (5th Cir. 1977) (enumeration added).
 
 
 39
 The Court in its opinion then went on to say: "Her intense fear for her life was the predicate for the bargain, and the Government's failure to explain fully and strongly this part of the agreement reduced its advocacy of her cause almost to an empty gesture." Id. at 704. The Court concluded, "The Government must again try to prevent Bauer's extradition to Switzerland or France. We are not convinced that the vast powers of persuasion at the command of the Departments of Justice and State have been adequately applied to Bauer's cause." Id. at 706.
 
 
 40
 The United States Government began to act immediately after the 1977 decision was handed down on June 22. In late June or early July, the Assistant Legal Advisor for Management of the Department of State and also the Swiss Desk Officer held an informal conference on the case with the First Secretary to the Swiss embassy. As a result of this conference, the Swiss authorities replied in a diplomatic note of July 22, 1977, that they wished to "uphold their request for extradition of the aforementioned Swiss citizen, first issued in the embassy's note of September 22, 1967, based on the treaty of extradition of May 14, 1900, . . ." Next, on September 2, 1977 Deputy Attorney General Peter F. Flaherty wrote a five page letter to Secretary of State Vance detailing the Bauer case. Printed in the note are the critical statements in that letter which undertook to meet the requirements laid down by the Court of Appeals in its 1977 decision. They begin on page 3 and run to the end of the letter.[4]
 
 
 41
 It will be observed that the four requirements stated by this Court in its 1977 opinion were covered in detail in that portion of the letter quoted in the footnote.
 
 
 42
 Secretary of State Vance then by diplomatic letter dated October 26, 1977, again asked the Swiss government to withdraw its request for the extradition of Josette Bauer. This diplomatic message is reproduced in full below.[5] Two aspects of the contents of this letter merit particular stress. First, the letter transmitted to the Swiss government the entire letter from the Deputy Attorney General. Then the Secretary of State adopted the statement of the Department of Justice in its letter which emphasized the importance of persuading the government of Switzerland to withdraw its request. Second, and even more persuasive, the Secretary of State clearly implied that because of the actions of the courts, the United States government found itself in an exceeding embarrassing position which might force it to violate the extradition treaty. The Secretary then made the plea that the Swiss government withdraw its request to avoid placing the United States government in this difficult position.
 
 
 43
 The Court accepts this communication by the Secretary of State as a strong presentation by the United States government. The Secretary placed the government in the position of being in serious difficulties because of this matter, and, therefore, asking the Swiss government to help out.
 
 
 44
 In spite of this presentation by the Secretary of State, the Swiss government again asserted its request for extradition in a diplomatic letter dated November 21, 1977. In support of its continued request, the embassy forwarded to the Department of State on February 8, 1978 statements from the heads of the Departments of Justice and Police of the two cantons concerned, Berne and Geneva. These officials certified that they would take all necessary steps to preserve the safety of Bauer. In both instances outstanding safety records in the prisons were cited. It was stated that in the prison where Bauer would likely complete her prison term, "no case of aggression or homicide (has) ever occurred". In the covering letter the Swiss federal government transmitted these certifications as "appropriate assurances for the complete safety of Mrs. Geisser".
 
 
 45
 Finally, shortly after the decision by Judge Mehrtens which is now being reviewed on appeal, the Department of State undertook further steps. On November 9, 1978, a diplomatic meeting was held at the Department of State between James E. Goodby, the Deputy Assistant Secretary for European Affairs, and others with Swiss Ambassador and his two first secretaries. The text of the memorandum covering this meeting is reproduced in full in the note.[6]
 
 
 46
 In this discussion the acute embarrassment of the United States government as well as the fears of Josette Bauer for her life and safety were clearly reiterated. But these assertions fell upon skeptical ears. The Swiss Ambassador did again consult with his government, however. In another meeting at the Department of State on December 18, 1978 between Mr. Goodby and the Swiss Ambassador, the Ambassador confirmed that the Swiss government had again declined to withdraw its request for extradition. He stressed that the Swiss government relied upon the reasons set out in its letter of March 15, 1976. The text of this letter, the most complete and thorough letter which the Swiss government sent in this case, appears below.[7]
 
 
 47
 It is the conclusion of the Court that these efforts undertaken by the United States government since the 1977 decision comply with the promise of the government to exercise its best efforts to avoid the extradition of Josette Bauer to Switzerland or France.
 
 
 48
 These efforts precisely meet the requirements set up by this Court in its decisions in 1975 and 1977. The phrase "best efforts" cannot be interpreted as an absolute. There can be no test demanding that the government has been shown to have failed to exercise its best efforts so long as the extradition takes place. It is clear from the 1975 and 1977 decisions that compliance with the plea bargain does not require a guarantee that Bauer will not be extradited to Switzerland.
 
 
 49
 "Best efforts" must be interpreted realistically in the world of international relations. Best efforts cannot be interpreted as the "strongest possible efforts". The United States need not go to war with Switzerland to enforce this plea bargain. Nor is it required to break diplomatic relations or take other extreme international measures. This Court could not accept the conclusion that best efforts would require the Secretary of State to travel to Switzerland and talk personally with the top members of the Swiss government. This would require the expending of all of our diplomatic strength and prestige on this particular case. Best efforts can only mean full pursuit of the cause through diplomatic channels in dealing with a friendly nation.
 
 
 50
 The United States government went beyond a request with reasons stated. It indicated a measure of humiliation in Secretary of State Vance's letter and in the final conference with the Swiss Ambassador. Yet even this did not persuade. We have no right to evaluate the Swiss point of view that one convicted of patricide who escaped while serving her sentence must complete her debt to Swiss society.
 
 
 51
 What else is there that the United States government could do within the realm of reasonable diplomatic efforts? It could continue to hold meetings and write letters, but this in turn would ultimately become a violation of our government's treaty obligations. The past history of this case shows that it is unrealistic to assume that at some time the Swiss government would yield and no longer ask that Josette Bauer, a Swiss citizen, be returned to Switzerland to complete her sentence. The Swiss government has shown itself adamant.
 
 
 52
 It is well to recognize that while properly protecting the constitutional rights of individuals, the courts must tread carefully when they draw conclusions concerning delicate problems of international relations in the world of diplomacy. It is not remiss to note the matter of common knowledge that it is the Swiss government which is representing the government of the United States in Iran today and in negotiations to free the United States government's diplomatic hostages being held in Iran. This Court cannot conclude that the case of Josette Bauer must take precedence over the other important friendly and cooperative relationships between the two nations involved. A "best efforts" promise cannot be pushed so far.
 
 
 53
 The Swiss government has over and over again rebuffed our requests and protestations. There is not the slightest indication that further negotiation can change its views. The only alternative which now remains if Bauer is not to be subject to extradition is a decision by this Court which would force the United States government to violate its treaty.
 
 
 54
 "Best efforts" cannot be taken to require a violation of treaty by the United States. The promise would have to contain stronger and more specific language to force this. This record reveals that in diplomatic terms the government has requested, has tried to persuade several times, and has humbled itself to the Swiss government in its attempt to get the Swiss government to withdraw its request. All of these actions have not availed and there is not the slightest indication in the record that they could avail in the future. No matter how ill-advised this plea bargain may have been in its inception, a best efforts promise cannot force the government to violate its treaty obligations.
 
 
 55
 In the 1977 decision of this Court it was concluded that the District Court's finding that the government had failed to use its best efforts was not clearly erroneous. Fed.R.Civ.P. 52(a). Sicula Oceanica, S. A. v. Wilmar Marine Eng. & Sales Corp., 413 F.2d 1332 (5th Cir. 1969). It is here concluded that with the undertakings which the government has made since the 1977 decision, the finding of the District Court on remand of the breach of a plea bargain by the government is clearly erroneous. Having now expended its best efforts through having complied with the steps required by this Court in its two prior decisions, the United States government has discharged its obligation under the plea bargain and no constitutional right of Josette Bauer has been infringed.
 
 
 56
 The decision of the District Court must be vacated, and in this proceeding for habeas corpus and other relief, judgment must be awarded the defendants.
 
 
 57
 VACATED and JUDGMENT RENDERED for United States of America, Defendant, and Hector Graber, Consul General of Switzerland, Defendant-Intervenor.
 
 
 
 [1]
 The record reveals that this last aspect of the plea bargain was confused. At one point in this case the District Judge held that the plea bargain was an absolute promise that Bauer and Lambert would not be sent to France or Switzerland. But, as shown later in this opinion, it is now settled that the plea bargain obligated the government to make its "best efforts" to avoid the return of Bauer and Lambert to France or Switzerland
 It also should be pointed out that the plea bargain was inexact. It was stated in terms of "deportation" to France or Switzerland, Geisser v. United States, 513 F.2d 862, 864 n.4, 868 n.9 (5th Cir. 1975). The issue is not deportation at all; it is extradition. Extradition is subject to specific international obligations while deportation is essentially at the option of the deporting country.
 
 
 [2]
 The details concerning the plea bargaining and the effectiveness of Josette Bauer's testimony are related in a letter to Bauer's counsel by William Earle, Special Attorney to the Department of Justice. This letter is reproduced in full in footnote 5 of Chief Judge Brown's opinion rendered the first time the case reached this court, 513 F.2d 862, 865 (1975)
 
 
 [3]
 The complete text of the exchange of letters between Deputy Attorney General Harold R. Tyler and Deputy Secretary of State Robert S. Ingersoll has been printed in footnotes 1 and 2 to the second appearance of the case in this Court. 554 F.2d 698, 700 (1977). The crucial letter from the Swiss government, dated March 15, 1976, is printed in full at footnote 7, infra
 
 
 [4]
 In reliance upon our agreement with her, Bauer cooperated fully with our Government. She gave crucial testimony which resulted in the conviction in this country of a major narcotics trafficker. The District Judge who presided at that trial described her as one of the most impressive witnesses he had ever encountered. In addition, she provided intelligence information that our representatives regarded as invaluable. Her almost "total recall", to employ the description used by the Customs agent who repeatedly dealt with her, led to at least ten arrests abroad and otherwise contributed significantly to efforts to frustrate the international narcotics trade. This country and others have benefited from Ms. Bauer's full cooperation. To a significant-probably decisive-degree, that cooperation was secured by our assurance that every effort would be made to prevent her extradition. She is accordingly entitled to every consideration. In view of her important contribution to worthy law enforcement goals and our promise to her, she is certainly entitled to have us pursue any proper avenue which might persuade the Confederation of Switzerland to withdraw its request for her extradition
 The Court of Appeals stated that Ms. Bauer's "intense fear for her life was the predicate for the bargain." We have no reason to quarrel with that conclusion. Indeed, it accurately reflects the impression of our representatives who dealt with her at the time. Ms. Bauer feared that if she were returned to Switzerland after having provided information on international narcotics smuggling, she would be killed. Her fear seemed fully warranted to our officials at the time, as it would to anyone familiar with the sordid business of narcotics trafficking.
 Part of the bargain permitted her to enter a plea of guilty to reduced charges. It later-and somewhat unexpectedly-became necessary for her to testify against a major narcotics smuggler, the "traffic manager" who had supervised Bauer. Because her cooperation would thus become public, she initially balked. According to the agent who dealt with her throughout this period, "Bauer would break down and actually tremble for fear of what might happen" as a result of her testimony against her former boss in the narcotics smuggling conspiracy. In order to console her and to secure her continued cooperation, Bauer was told that we would almost certainly be able to prevent her extradition to Switzerland. According to the same agent, Bauer's fear existed "because of some very prominent people, including a former attorney in Switzerland, who had facilitated (her) escape (in Switzerland and) had in fact negotiated with some of his associates to facilitate her escape from prison and ability to flee the country." Subsequently the same agent contacted Bauer while she was incarcerated and advised her that Swiss authorities wished to interview her. According to the agent, Bauer became "quite upset" and indeed "almost panicked" because "some of the people that she had provided information on, were people of important positions, who allegedly were outstanding citizens, who were in high places, not necessarily government places, but well established in the business world."
 While Bauer's intense fear of reprisal is established by her own testimony, that of her lawyer, and the representations of two Department of Justice attorneys as well, it is the Customs agent who was most frequently in contact with her and thus in the best position to assess the matter. We are accordingly enclosing with this letter a copy of the agent's letter to her counsel, adopted and affirmed at the original hearing on this matter, for your consideration. We believe it will enable a full appreciation of Ms. Bauer's predicament.
 In the context of the ugly business of narcotics smuggling, we struck a bargain with Josette Bauer. Significant breaks in this enormously lucrative area are few. It was believed that her assistance would help control the international narcotics trade and it, in fact, had precisely that effect. Nonextradition, with its consequent avoidance of her remaining two and one-half year term of incarceration in Switzerland, may have seemed a reasonable price to pay for her cooperation at the time. As it turns out, however, with opportunity for reflection and thorough analysis, Switzerland's right under the treaty to her extradition was not ours to bargain with. We do, however, believe that the equities redound to her favor in any event. It is for this reason that we request that you make known to the Confederation of Switzerland the importance and extent of Ms. Bauer's assistance and the fact that this assistance was attained only by allaying her intense fear of reprisal by effectively assuring her that she would not be returned to Switzerland. Perhaps a thorough and forceful demonstration of these matters will persuade Switzerland to withdraw its extradition request, particularly if that Government understands the importance of Bauer's cooperation to the world community. It is our sincere hope that this course will avoid Ms. Bauer's extradition.
 Please know that we greatly appreciate your Department's efforts, both past and anticipated, to resolve this painful problem which is not of your own making. We shall attempt to continue further court proceedings pending our receipt of your advice at your earliest convenience.
 
 
 [5]
 The Secretary of State presents his compliments to His Excellency the Ambassador of Switzerland and has the honor to refer to the note of the Embassy of Switzerland dated July 22, 1977, concerning Mrs. Josette Geisser-Bauer
 The United States Government has already gone to the United States District Court twice and to the United States Court of Appeals twice in support of the efforts of the Government of Switzerland to extradite Mrs. Bauer. As the Ambassador knows the case was again remanded to the same District Court which has twice enjoined her extradition.
 The Deputy Attorney General has written the enclosed letter, dated September 2, 1977, which makes clear that the Justice Department believes that the assurances given to Mrs. Bauer against her being returned to Switzerland were necessary to obtain her "invaluable" information to "frustrate the international narcotics trade." The Department of Justice has vouched for the fact that Mrs. Bauer feared for her life because of her assistance to the United States, should she be returned to Switzerland. The Deputy Attorney General concludes by expressing "sincere hope" that a further demonstration of the importance of Mrs. Bauer's cooperation to the world community will persuade the Government of Switzerland to withdraw its extradition request. The Secretary of State wishes to express that same hope.
 In the light of the facts set forth by the Deputy Attorney General and of the course of the previous litigation, it appears unlikely that the courts of the United States will permit Mrs. Bauer's extradition to Switzerland.
 In the circumstances, the Secretary of State respectfully urges the Government of Switzerland to reconsider the decision in its note of July 22, 1977, and withdraw its request for the extradition of Mrs. Bauer. In the view of this Department that action would be far preferable, from the standpoint of bilateral relationships and of legal precedent, to the expected action of the District Court to again enjoin that extradition on grounds which the United States Government would find difficult, if not impossible to challenge.
 
 
 [6]
 SUBJECT: Bauer Extradition Case
 PARTICIPANTS:
 USG
 James E. Goodby, Deputy Assistant Secretary for European Affairs
 James H. Michel, Deputy Legal Advisor
 Knute E. Malmborg, Office of Legal Advisor
 R. C. Porter, EUR/CE (Notetaker)
 Switzerland
 Raymond Probst, Ambassador
 Daniel Dayer, First Secretary
 Hans-Ulrich Mazenauer, First Secretary
 Mr. Goodby apprised Ambassador Probst of the US government's wish that Switzerland withdraw its request for the extradition of Josette Geisser Bauer. He summarized the case, noting:
 -Mrs. Bauer's testimony was the key to successful prosecution of an international drug syndicate,
 -She feared for her life were she to be returned to Switzerland,
 -Assurances had been made to Mrs. Bauer by a Justice Department representative that she would not be extradited (without the knowledge and consent of the State Department), and
 -Mrs. Bauer's extradition continues to be blocked by the US.
 Ambassador Probst commented that Swiss authorities could not accept the view that Mrs. Bauer's life would be threatened in a Swiss prison because of her testimony against the drug ring.
 Mr. Michel explained further that the Court had obliged the government to make its "best efforts" to avoid Bauer's extradition, a formulation based upon the assurances given her. These assurances had significantly affected Bauer's rights as an individual under the Constitution. Mr. Michel acknowledged that even after protracted litigation the Court might not be satisfied. He asked that the Swiss Government avoid an impasse by withdrawing its extradition request.
 Ambassador Probst responded he understood the US government's obligations to Mrs. Bauer, and noted that there were also obligations to Switzerland under the treaty. He would convey the request to his government, but he personally doubted the extradition request would be withdrawn.
 The Swiss Ambassador reviewed the US-Swiss Extradition Treaty. He noted the legal obligation of the US government to extradite under the agreement. He commented that if extradition cannot be made, then this is the fault of the US government. One branch of the government had given assurances that should not have been given because of the treaty. As a lawyer, it was Probst's personal view that there must be US recognition of the Swiss right to extradite. "We must be careful," said Probst, "not to create a precedent to be used in another court, in another case".
 Responding, Mr. Goodby assured that the US government does not question the legal right of the Swiss government to extradite Mrs. Bauer and that the Bauer case is not viewed as a precedent. Mr. Michel noted that the Bauer case was unique in fact, in its complications. He could not imagine a legal precedent being drawn from the case. Should the Swiss government agree to withdraw its extradition request, the US would regard the step as not impairing in any way the US obligation to respect the treaty.
 Probst and Dayer returned again to the question of a possible precedent in Swiss withdrawal of the Bauer extradition request. Probst worried that it might create a blueprint for fighting extradition.
 Michel countered, arguing that there is now a full awareness of the error made in the Bauer case. The US Attorney's manual has been amended by the Department of Justice with instructions that assurances not be given which might impair the fulfillment of US treaty commitments.
 He suggested that the worst precedent would be a continuation of the case, risking an adverse judicial decision.
 Dayer interjected that the plea bargaining and the US Attorney's assurances in this case had come after the extradition proceeding. Michel observed that it might be better to litigate the issue of possible conflict between a treaty and a plea bargain in a different case and to resolve the Bauer case through diplomatic means by withdrawing the Swiss extradition request.
 
 
 [7]
 I have the honor to refer to your letter of February 13, 1976, and to transmit the views of the Swiss Government relating to the extradition of Josette-Clair Geisser, divorced Bauer
 The Swiss Government has given long and careful consideration to the matters discussed in your letter. It has concluded that, in order to preserve its important interests in the administration of justice and its rights under the treaty in question, it must respectfully maintain its request for Ms. Geisser's extradition.
 The Swiss Government continues to feel that the extradition of Ms. Geisser is called for by the United States' treaty obligations to Switzerland and by international law and that therefore the extradition should not be affected by internal United States matters. Further, from a practical viewpoint, the Swiss Government feels that a withdrawal of its request might itself cause harm to the extradition relations between the United States and Switzerland.
 As you know, Ms. Geisser, a Swiss citizen, was tried and convicted of aiding and abetting the murder of her father for financial gain in Switzerland. She escaped from Swiss confinement while still having to serve about two-and-a-half years of her sentence. I am sure you can appreciate the strong feeling in Switzerland that Switzerland's system of justice, and our public's deep expectations concerning the fair administration of justice, make it a matter of considerable importance that she be returned to Switzerland to complete her sentence for this heinous crime.
 Upon learning of Ms. Geisser's arrest in Florida the Swiss Government immediately took all necessary steps to obtain her extradition, requesting the Department of State to arrange for Ms. Geisser's provisional arrest and detention on September 18, 1967, formally requesting her extradition by the Secretary of State on September 22, 1967, filing an extradition complaint in the United States District Court for the Southern District of Florida on October 4, 1967, obtaining an arrest warrant from that court on October 4, 1967, and obtaining an extradition order from that court on November 21, 1967. Thus, as of November 21, 1967, the Swiss Government had completed all the steps necessary for Ms. Geisser's extradition and merely awaited the decision to extradite by the Department of State.
 We have now learned that Ms. Geisser contends that-subsequent to and in spite of the above efforts-she and certain employees of the Department of Justice, without notice to the Swiss Government or the District Court, entered into an agreement, one purpose of which was to prevent her extradition to Switzerland. If this alleged agreement were enforced in the manner requested by Ms. Geisser, the inevitable consequence would of course be to nullify the District Court's order of extradition and the extradition rights of the Swiss Government. As I am sure you realize, the Swiss Government feels that such activities should not affect its rights to extradition.
 Please accept, Mr. Secretary, the assurances of my highest consideration.